<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                                
                United States Court of Appeals
                    For the First Circuit

No. 98-1765

                      IN RE: UNITED STATES
                (LORENZO MUNOZ FRANCO, ET AL.),

                          Petitioner.

  ON PETITION FOR MANDAMUS TO THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

       [Hon. Carmen Consuelo Cerezo, U.S. District Judge]

                             Before

                    Torruella, Chief Judge,
              Selya and Boudin, Circuit Judges.
                                
                                

    J. Douglas Wilson, Attorney, Criminal Division, U.S.
Department of Justice, with whom Guillermo Gil, United States
Attorney, was on brief, for petitioner.
    Michael S. Pasano, with whom Zuckerman Spaeder Taylor & Evans,
LLP, Graham A. Castillo Pagan, Joseph J. Rucci, Jr., and Rucci,
Burnham, Carta & Edelberg were on brief for respondents Ariel and
Enrique Gutierrez.
    Harry Anduze Montao, with whom Jorge L. Arroyo Alejandro was
on brief, for respondent Lorenzo Muoz Franco.

October 13, 1998

           SELYA, Circuit Judge.  After Chief Judge Cerezo of the
United States District Court for the District of Puerto Rico set a
firm trial date in a case presently pending before her, United
States v. Lorenzo Muoz Franco, et al., No. 95-386, the government
moved at the eleventh hour to disqualify the judge from further
involvement.  The judge denied the motion following a three-day
evidentiary hearing.  The government then sought a writ of mandamus
from this court directing Judge Cerezo to recuse herself.  We
provisionally stayed the impending trial, set an expedited briefing
schedule, and entertained oral argument.  We now conclude that the
government failed to prove what it had alleged vis--vis the judge,
and therefore deny the petition.
           At the outset, it is important to note the narrowness of
the government's position:  it does not contend that the judge has
any actual bias or prejudice in this case and it does not seek her
recusal under 28 U.S.C.  144 (1994).  It likewise eschews the
mandatory bases for disqualification limned in 28 U.S.C.  455(b)
(1994).  Instead, the government premises its mandamus petition
(and the underlying recusal motion) exclusively on 28 U.S.C.  
455(a) (1994), which provides:
           Any justice, judge, or magistrate of the
           United States shall disqualify himself in any
           proceeding in which his impartiality might
           reasonably be questioned.
           In cases involving section 455(a), the recusal
determination inevitably turns on the facts.  See Liljeberg v.
Health Servs. Acquisition Corp., 486 U.S. 847, 865 (1988).  
Consequently, we describe the pertinent events in some detail.  We
then discuss the applicable law and, finally, undertake an analysis
of the recusal question.
I.  BACKGROUND
           United States v. Muoz Franco stems from the May 1990
failure of Caguas Central Federal Savings Bank (Caguas), reputed to
be the largest bank failure in the history of Puerto Rico.  The
government tells us, without demurrer by the respondents, that
Caguas's collapse resulted in aggregate losses exceeding
$120,000,000.
           The defendants in Muoz Franco include two former Caguas
officials, namely, Lorenzo Muoz Franco (Muoz), Caguas's chief
executive officer, and Francisco Snchez Arn (Snchez), Caguas's
chief lending officer.  The indictment charges Muoz and Snchez
with misapplying bank funds, making false entries in banking
records, and participating in a conspiracy to perpetrate these
offenses and to commit bank fraud.  See 18 U.S.C.  371, 657,
1006, & 1344 (1994).  In its narrative portions, the indictment
describes a "loan-kiting" scheme that purportedly involved the
misapplication of real estate loan proceeds to shore up other
(failing) commercial loans, thereby creating the illusion that the
latter loans were performing well.  The government alleges that one
object of the scheme   which supposedly persisted for almost the
entire decade between 1980 and 1990   was to stave off regulatory
intervention and keep Muoz and Snchez in power.
    The transaction upon which the government bases its
recusal initiative took wing in 1986 when the judge's husband,
Benny Frankie Cerezo, sought to borrow funds from Caguas.  Mr.
Cerezo approached Arturo Somohano, Caguas's senior vice-president
for commercial lending, and explained that he wished to obtain a
loan so that he could develop a twenty-eight acre farm and
subdivide it into house lots.  The record is tenebrous as to  
whether Mr. Cerezo furnished appraisal reports in support of the
loan application, but we do know that he at least provided Caguas
with the cover letters from two appraisal reports prepared in 1984.  
Both letters subscribed that the acreage had a value of $200,000 or
more.
    Despite the fact that Mr. Cerezo's checking account was
overdrawn, Somohano approved the application and the Cerezos
obtained a $150,000 loan from Caguas in the autumn of 1986 at two
points over prime, secured by a first mortgage on the farm.  The
loan contract and related documents were signed by Mr. Cerezo
(individually and on behalf of his wife, via power of attorney).  
The promissory note called for eleven monthly interest payments and
repayment of the loan principal on the first anniversary.  Between
November 1986 and November 1987 (when the loan matured), the
Cerezos made at most three interest payments.
    As the note neared maturity, Mr. Cerezo requested a loan
of $557,000 as additional financing for his shoe business. He
initially made this request in a Spanish-language letter to Muoz,
dated October 26, 1987.  The salutation of the letter read
"Estimado amigo Lorenzo" ("Esteemed friend Lorenzo"), but the body
of the letter employed formal verb forms (conjugated for use with
"usted" rather than with the more familiar "tu").  Muoz referred
the letter to Somohano and, three days later, Mr. Cerezo wrote
directly to Somohano, making essentially the same request and
indicating that the earlier letter to Muoz had been sent in error.  
Caguas never approved the $557,000 loan.
    Upon maturity, the Cerezos failed to repay the farm loan.  
During the initial post-default period, which extended from
November 1987 (when the note matured) until May 1990 (when control
of the note passed into the hands of third parties, see infra), the
record does not reflect that either Muoz or Snchez had anything
to do with Caguas's collection efforts.  We review what transpired.
    Over the first eight months of the post-default period,
Caguas sent Mr. Cerezo three collection letters, each of which
demanded immediate payment.  Somohano sent a copy of the second
letter to Judge Cerezo at the Cerezos' home address because he was
concerned that, as a cosigner by power of attorney, she might not
have been aware that the loan even existed.  The letters did not
accomplish their intended purpose.  Mr. Cerezo informed Caguas that
he did not have liquid funds sufficient to repay the debt.  He
proposed several alternatives, such as working out a plan to sell
the farm or reviving his application for a loan to finance the
expansion of his shoe business (combining the existing loan with
the new loan).  Because Somohano terminated his employment with
Caguas shortly after sending the second collection letter, these
suggestions were considered by Pedro Suau, Caguas's assistant vice-
president for commercial lending.  Suau countered with a proposal
to rewrite the farm loan for $185,000 in order to cover the accrued
interest and create a reserve for interest payments over the
following six months.  Mr. Cerezo displayed no enthusiasm for this
proposal and faxed a letter to Suau in October 1988, with a copy to
Muoz, urging approval of his $557,000 loan request.  Neither the
$557,000 "shoe business expansion" loan nor the $185,000
refinancing of the farm loan ever materialized.
    By February 1989, the Cerezos owed a total of $185,373.57
in principal plus accrued interest on the delinquent farm loan.  At
that juncture, Suau recommended transferring the matter to the
bank's special loans department (which handled workouts).  The
transfer did not occur at that time, however, as the document
bearing Suau's recommendation also carried an undated, unsigned,
handwritten notation that stated:  "This case was not authorized to
go or to pass into the special department."  The next month, Mr.
Cerezo sent $5,000 to Caguas in partial payment of accrued interest
on the delinquent farm loan.  He made no further payments, and
Caguas eventually transferred the loan to the workout section.  It
was then referred to the bank's outside counsel, who sent a dunning
letter to Mr. Cerezo (with a copy to Judge Cerezo) on November 21,
1989.
    Mr. Cerezo asked the lawyers for a ninety-day extension,
stating that, if he could not sell the farm for an amount
sufficient to liquidate the debt within that interval, he would
deed the property to Caguas as payment in kind.  The law firm
approved the extension request, but nothing happened.  The
attorneys fired off another collection letter.  In response, Mr.
Cerezo proposed surrendering the farm as payment in kind.  Caguas
indicated that it would consider the proposal on condition that the
Cerezos secure a satisfactory appraisal of the property.  Mr.
Cerezo acquiesced to this condition and, in May 1990, he retained
an appraiser and advised Caguas of the appraiser's identity.
    On May 25, 1990, Caguas failed.  The Resolution Trust
Corporation (RTC) moved into the picture, first as conservator and
later as receiver.  On August 31, the RTC and Banco Santander
Puerto Rico (Santander), an unrelated third party, signed a
purchase and assumption agreement pursuant to which Santander
bought various assets of Caguas, including the farm loan.  On
February 22, 1991, Santander's attorneys advised Mr. Cerezo that
Santander had acquired the note and mortgage, and was willing to
accept the farm as payment in kind.  Mr. Cerezo did not respond to
this communique.
    On April 3, 1991, Santander brought a foreclosure
complaint against the Cerezos, alleging an aggregate debt of
$220,175.34 through March 28, 1991.  Process was served on both Mr.
Cerezo and Judge Cerezo during June of that year.  The Cerezos did
not contest the allegations and a judgment of foreclosure entered
on October 28, 1991.  At the ensuing public auction, held on May 6,
1992, the farm was sold to CREFISA, Santander's real estate
subsidiary.  CREFISA held the property for a time and, in 1994,
sold it to an unrelated third party, in an arm's-length
transaction, for $92,000.  Santander never sought to obtain a
deficiency judgment against the Cerezos, apparently in keeping with
its custom of not pursuing deficiencies on defaulted real estate
loans.  Neither Muoz nor Snchez had any relationship with
Santander, and neither of them participated in any way in the
decision not to pursue the deficiency.
II.  APPLICABLE LEGAL STANDARDS
    Section 455(a) stands at a crossroads where competing
policy considerations frequently intersect.  On the one hand,
"courts must not only be, but must seem to be, free of bias or
prejudice."  In re United States, 666 F.2d 690, 694 (1st Cir.
1981).  On the other hand, recusal on demand would put too large a
club in the hands of litigants and lawyers, enabling them to veto
the assignment of judges for no good reason.  Thus, compulsory
recusal must require more than subjective fears, unsupported
accusations, or unfounded surmise.  See id.
    Section 455(a) attempts to reconcile these competing
policies.  The statute requires a judge to step down only if the
charge against her is supported by a factual foundation and "the
facts provide what an objective, knowledgeable member of the public
would find to be a reasonable basis for doubting the judge's
impartiality."  Id. at 695 (emphasis in the original).  While
doubts ordinarily ought to be resolved in favor of recusal, seeNichols v. Alley, 71 F.3d 347, 352 (10th Cir. 1995); United Statesv. Dandy, 998 F.2d 1344, 1349 (6th Cir. 1993), the challenged judge
enjoys a margin of discretion:
    [T]he analysis of allegations, the balancing
    of policies, and the resulting decision
    whether to disqualify are in the first
    instance committed to the district judge.  
    And, since in many cases reasonable deciders
    may disagree, the district judge is allowed a
    range of discretion.  The appellate court,
    therefore, must ask itself not whether it
    would have decided as did the trial court, but
    whether that decision cannot be defended as a
    rational conclusion supported by [a]
    reasonable reading of the record.

In re United States, 666 F.2d at 695.
    Inasmuch as this matter comes to us by way of a petition
for a writ of mandamus, two additional sets of considerations are
implicated.  The first is surmountable.  For both prudential and
practical reasons, we must be slow to "foster piecemeal review and
disturb the historic relationship between trial and appellate
courts."  In re Cargill, Inc., 66 F.3d 1256, 1259 (1st Cir. 1995),
cert. denied, 517 U.S. 1156 (1996).  It is only in unusual
situations that interlocutory review of a judge's refusal to step
aside is available through mandamus.  See In re Martinez-Catala,
129 F.3d 213, 217 (1st Cir. 1997).
    However, that principle is not ironclad.  When "the issue
of partiality has been broadly publicized, and the claim of bias
cannot be labelled as frivolous," the propriety of judicial
disqualification need not await end-of-case review.  In re United
States, 666 F.2d at 694.  This is especially true in a criminal
case in which the government seeks the judge's recusal, for a
defendant's verdict will terminate the case, thereby rendering the
usual remedy, end-of-case appeal, illusory.  Cf. United States v.
Patterson, 882 F.2d 595, 599-600 (1st Cir. 1989) (holding that
mandamus was an appropriate avenue for government to obtain review
of district court determination that prior convictions did not
qualify as predicate offenses since government could not appeal
from an ensuing sentencing order).  Here, the issue of recusal velnon has attracted widespread interest and, on its face, the
government's allegation cannot be termed frivolous.  Thus, mandamus
review appears proper.
    The second set of considerations relates to the fact that
mandamus has its own ingrained jurisprudence.  An applicant for the
writ "must show both that there is a clear entitlement to the
relief requested, and that irreparable harm will likely occur if
the writ is withheld."  In re Cargill, 66 F.3d at 1260.  Taking
these elements in reverse order, the government's claim of  
irreparable harm has obvious weight.  Unlike situations in which a
claim of irreparable harm is undercut by the availability of full
end-of-case review, see, e.g., id. at 1264 n.10, the government
here will have no effective means of correcting the judge's alleged
error   her failure to recuse herself   on appeal if the case is
tried and the defendants prevail.
    In our view, these same circumstances also affect the
application of the "clear entitlement" requirement.  In the run-of-
the-mine recusal case, "mandamus is almost always withheld   we do
not say always   unless the petitioner demonstrates that it is
'clearly' entitled to relief."  In re Martinez-Catala, 129 F.3d at
218.  In other words, "mandamus requires a case not merely close to
the line but clearly over it."  Id. at 221.  We believe it is
questionable whether this requirement should be applied stringently
when the government seeks a judge's disqualification in a criminal
case.  Because of the government's inability to press an end-of-
case appeal, see supra, we think it would be fairer in such
circumstances to use the ordinary abuse-of-discretion standard
rather than the more exacting standard usually applicable to
petitions for mandamus.  We follow this course.
III.  THE MERITS
    The question before us is not whether we would have
denied the government's recusal motion as Judge Cerezo did, but,
rather, whether her denial of it constituted an abuse of
discretion.  The answer to this question depends on whether a
reasonable person, fully informed of all the facts, would doubt
Judge Cerezo's impartiality.  The standard, of course, is
objective, not subjective.
                               A
    Typically, cases implicating section 455(a) are fact-
specific, and thus sui generis.  Comparison, therefore, is an
inexact construct.  Nonetheless, a rough continuum of sorts emerges
from a study of the case law.  At one end are situations in which
the hypothesis of partiality is so compelling that the judge has no
real choice but to recuse herself.  See, e.g., Fredonia Broad.
Corp. v. RCA Corp., 569 F.2d 251 (5th Cir. 1978) (involving a
recusal motion based upon one party's representation by the judge's
former law clerk, who had served in that capacity during a prior
trial of the same action).  At the other end are situations in
which the hypothesis of partiality is so tenuous that the judge has
no real choice but to sit.  See Blizard v. Frechette, 601 F.2d 1217
(1st Cir. 1979) (involving a recusal motion based upon nothing more
than a judge's criticism of a party and her case in an opinion).  
Between these two polar extremes lies a zone in which the district
judge's discretion holds sway.  See In re United States, 666 F.2d
at 695.  If a case falls within this gray area, a court of appeals
ought not to interfere.
    These categories operate on two levels:  what is alleged
and what is proven.  See Blizard, 601 F.2d at 1221 ("A trial judge
must hear cases unless some reasonable factual basis to doubt the
impartiality or fairness of the tribunal is shown by some kind of
probative evidence."); cf. Liljeberg, 486 U.S. at 865 (admonishing
that "it is critically important in a case of this kind to identify
the facts that might reasonably cause an objective observer to
question [the judge's] impartiality").  Consequently, there are
situations in which the hypothesis of partiality sounds compelling
to a reasonable listener, but the supposed facts upon which the
hypothesis depends are, in the end, not proven.  Without facts to
substantiate a hypothesis of partiality, a case may well slide from
one pole of the continuum to the other, or to some point in
between.  The case at hand is a perfect illustration of this
phenomenon   and it is for this reason that the mandamus petition
fails.
                               B
    As we have explained, section 455(a) requires that we ask
whether a reasonable person, fully informed of all the relevant
facts, would fairly question the trial judge's impartiality.  The
facts proven below must dictate the answer to this question, not
the unverified suspicions harbored by the government or the
innuendo interspersed throughout both its recusal motion and its
mandamus petition.
    Stripped of the government's rhetorical gloss, the
relevant facts are as follows.  The Cerezos had a delinquent loan
at Caguas during a period in which Muoz and Snchez headed that
bank and allegedly engaged in a fraudulent loan-kiting scheme.  
There is absolutely no proof that Muoz or Snchez had anything to
do with approval of the Cerezos' loan.  By like token, there is no
basis for suggesting that the Cerezos secured the loan by undue
influence or other improper means.  Their combined earning power
and net worth augured creditworthiness; the bank obtained what
appeared at the time to be adequate collateral; the interest rate
(two points over prime) did not smack of favoritism; and Somohano's
uncontradicted testimony at the recusal hearing verified that
nothing in the loan documents indicated any irregularity.  While
Mr. Cerezo's checking account was underwater at the time, the
amounts of the overdrafts were relatively modest, and the record
does not contain any evidence that Caguas rejected other
prospective borrowers because of modest checking account
overdrafts.  Similarly, though Caguas may have used bad business
judgment in granting the farm loan, no adverse inference reasonably
can be drawn from that fact; had Caguas dealt only with rock-solid
borrowers and exercised prudence overall, the bank probably would
not have failed.
    The record is likewise bereft of any evidence that Caguas
deviated from regular practice in its handling of the loan, or that
Muoz and Snchez were involved in the loan's administration after
the initial default.  There is not a shred of proof that Caguas
exhibited less tolerance toward other borrowers who missed interest
payments or that Caguas treated other "problem" loans more
aggressively.  The same is true as to Caguas's actions following
nonpayment of the principal.  Although a total of almost four years
elapsed between default (November 1987) and foreclosure (October
1991), the relevant period is slightly over two-and-one-half years.  
Caguas failed in May of 1990, and anything that transpired after
that date had nothing to do with Muoz and Snchez.  From that
point forward, unrelated third parties   namely, the RTC and
Santander   were in the driver's seat.
    Moreover, Caguas did not let the matter lie fallow during
the post-default period.  It promptly sent a series of letters in
an effort to collect the debt.  Following this battery of letters
and a number of related telephone calls, the two sides exchanged
proposals for resolution of the impasse.  The other pan of the
scale is altogether empty:  the government adduced no evidence that
Caguas employed different stratagems or greater diligence in
respect to other defaulted commercial loans.
    An unknown person did overrule Suau's decision to
transfer the delinquent loan to the workout section during this
period, but that fact, standing alone and unexplained, proves
nothing.  The government neither called Suau as a witness nor
procured an affidavit from him.  It adduced no evidence tracing the
undated, unsigned, handwritten notation that upstaged Suau to
either Muoz or Snchez.  And, finally, it did not show that Caguas
customarily shifted loans of a similar age, size, and state to the
workout section.
    After Mr. Cerezo made a $5,000 payment on account, Caguas
referred the loan to outside counsel for collection.  The Cerezos
then were granted an additional ninety-day moratorium.  The record
does not indicate that this sort of extension was unusual, or that
it betokened any sort of special favoritism, or that either
criminal defendant was involved in the extension decision.  Mr.
Cerezo next agreed to obtain a new appraisal before deeding the
farm to Caguas in lieu of foreclosure.  At that point, Caguas's
insolvency intervened.
    Among the witnesses who testified, those best positioned
to know the details of what had happened were Somohano and Angel
Alicea Pars (Caguas's outside counsel).  After reviewing all the
loan documents, Somohano testified without contradiction that he
did not believe that Caguas afforded the Cerezos any preferential
treatment.  He also testified that the loan appeared to have
followed Caguas's normal collection procedures.  In respect to the
period after Caguas referred the loan to outside counsel (but
before the conservatorship attached), Caguas's collection attorney
testified in a similar vein:  no one at Caguas asked him to accord
kid-glove treatment to these debtors, and he accorded none.  He
also vouchsafed that there was nothing out of the ordinary in the
manner in which he proceeded in respect to this loan.  This
testimony, too, was unrefuted.
    In its only real effort to fill the evidentiary void, the
government notes that Mr. Cerezo addressed a request for additional
funding to his "friend," Muoz.  The letter itself is at best
ambiguous as to the extent of any friendship.  Moreover, despite
the government's claim of a sinister alliance, there is no
explanation of what relationship, if any, existed between the two
men.  Such an undeveloped suggestion, in and of itself, does not
mandate recusal.  See In re Beard, 811 F.2d 818, 828 (4th Cir.
1987) ("'Mere general allegations of intimacy of the judge with
opponents' are insufficient to require recusal . . . .") (quoting
Morse v. Lewis, 54 F.2d 1027, 1031 (4th Cir. 1932)); TV
Communications Network, Inc. v. ESPN, Inc., 767 F. Supp. 1077, 1079
(D. Colo. 1991) ("Mere allegations of a social relationship between
a judge and a litigant in his court are not sufficient grounds for
disqualification."); cf. In re United States, 666 F.2d at 696-97
("If the receipt by a judge's friend of a favor long ago from one
who is a present litigant should disqualify the judge, judges could
hope to preside without challenge solely in communities in which
they are strangers.").
    To sum up, there is simply no basis for a founded
conclusion that the Cerezos received any sort of preferential
treatment or that Caguas treated the Cerezos differently than any
other borrowers.  The record is equally barren of any evidence that
either of the criminal defendants dealt with Mr. Cerezo, had any
involvement with the approval or administration of the farm loan
(either before or after the Cerezos defaulted), or had anything
whatever to do with Santander's decision not to pursue the Cerezos
for the deficiency that resulted from its post-foreclosure sale of
the property.  On this exiguous record, it is surpassingly
difficult to see how the government can prevail.
                               C
    In a last-ditch effort to overcome the paucity of its
proof, the government maintains that the district judge's actions
during the recusal hearing provide grounds for disqualification.  
This is new matter, for the government never made this claim in the
district court and probably has waived it.  In all events, its
arguments sound suspiciously like arguments for the proposition
that the judge exhibited an actual bias against the government.  
This does not square with the government's repeated assertions that
its case for recusal in no way involves charges of actual bias, but
hinges strictly and solely on a professed appearance of bias.
    Passing this point and turning to what transpired at the
hearing, we note first that the substance of this recusal motion   
which the government hardly can be faulted for bringing   touched
upon an extremely sensitive subject, involving the financial
difficulties of the judge and her husband.  Under such
circumstances, we think that the judge would have been well-advised
either to bow out of the case or to ask that the recusal motion be
assigned to a different judge for hearing.  Still, the law does not
require a judge to step aside whenever a litigant raises a
sensitive subject   if it did, litigants would have an easy means
of disqualifying judges who were not to their taste   and this case
is no exception to that rule.  Indeed, recusal motions under
section 455(a), which customarily are decided by the judge whom the
movant seeks to disqualify, almost always involve the actions or
relationships of the judge and almost always require the judge to
appraise her own situation.  See In re Martinez-Catala, 129 F.3d at
220.  
    We note, too, that the court's inquiry into the
timeliness of the government's recusal motion   itself a proper
subject for scrutiny, see In re Abijoe Realty Corp., 943 F.2d 121,
126 (1st Cir. 1991)   necessarily involved an exploration into when
and how the government sought to substantiate the information it
had received about a delinquent Cerezo loan.  The judge expressed
understandable concern about several abortive attempts by the
government to obtain the loan file sub rosa, by employing various
artifices, including the issuance of a subpoena, later withdrawn,
that did not comply with the notification requirements of the Right
to Financial Privacy Act, 12 U.S.C.  3401-3422 (1994).  It is
evident that the judge's questioning went too far, and that its
tone at times was overly confrontational.  Yet, we find no basis
for concluding that an irredeemable conflict existed between the
judge's judicial role and her concerns as a bank customer.  As one
member of the Court recently observed,
     455(a) is triggered by an attitude or state
    of mind so resistant to fair and dispassionate
    inquiry as to cause a party, the public, or a
    reviewing court to have reasonable grounds to
    question the neutral and objective character
    of a judge's rulings or findings.  I think all
    would agree that a high threshold is required
    to satisfy this standard.  Thus, under  
    455(a), a judge should be disqualified only if
    it appears that he or she harbors an aversion,
    hostility or disposition of a kind that a
    fair-minded person could not set aside when
    judging the dispute.

Liteky v. United States, 510 U.S. 540, 557-58 (1994) (Kennedy, J.,
concurring in the judgment).  We do not believe that the manner in
which Judge Cerezo conducted the evidentiary hearing, though
inappropriate in certain respects, revealed anything that would
necessitate her recusal under these criteria.
    Our dissenting brother raises an argument that the
government eschews.  He charges that Judge Cerezo abused her
discretion by hearing the recusal motion.  See post at 30-31 &
n.10.  This is a startling proposition, unsupported by any
authority   and all the more startling because no party to the case
suggested below that a different judge should hear the motion.  
Although a trial judge faced with a section 455(a) recusal motion
may, in her discretion,  leave the motion to a different judge, seeUnited States v. Heldt, 668 F.2d 1238, 1271 & n.69 (D.C. Cir. 1981)
(per curiam); 13A Charles Alan Wright, Arthur R. Miller, & Edward
H. Cooper, Federal Practice and Procedure  3550 (2d ed. 1984), no
reported case or accepted principle of law compels her to do so   
especially where, as here, all the litigants apparently are content
to have her hear the motion.  We conclude, therefore, that Judge
Cerezo acted within her proper role in conducting the hearing
herself.  See In re Martinez-Catala, 129 F.3d at 220; In re United
States, 666 F.2d at 695.
                               D
    This is a vexing case.  In its recusal motion, the
government painted a picture of coziness and preferential treatment
which, if proven, plainly would have created an appearance of
partiality and thus have demanded recusal.  But those allegations
were not proven.  Then, in its mandamus petition, the government
renewed its charges, but with variations designed to account for
the wide disparity between what it had alleged and what it had
succeeded in proving.  Like the government's original scenario,
these rhetorical improvisations do not withstand scrutiny.
    In the end, we are left with nothing more than these few
facts:  the Cerezos, during a small part of the relevant decade,
borrowed money from Caguas at a standard rate and on conventional
terms; they were unable to repay the loan; and the bank, acting
with a ponderousness that frequently characterizes large
bureaucratic institutions, took its time about instituting
collection proceedings.  Apart from the loan itself, the Cerezos
received no special benefit from Caguas   and there is no proof
that Muoz or Snchez either facilitated the loan or contributed to
the delays that marked the collection process.  These facts do not
transport the case into the zone of obligatory recusal, but,
rather, bring it within the "range of discretion" in which a
decision either way can "be defended as a rational conclusion
supported by [a] reasonable reading of the record."  In re United
States, 666 F.2d at 695.  Thus, although Judge Cerezo could have
chosen to withdraw   indeed, we think that may have been the wiser
course and that many judges would have taken it   and may yet
choose to do so, she was not duty bound to disqualify herself from
presiding over the criminal trial.
    This conclusion is reinforced by the history of Caguas's
difficulties.  The RTC brought a civil suit in May 1993 against
Muoz, Snchez, and several former directors of Caguas, alleging
that these persons caused the extravagant losses that Caguas
experienced.  Judge Cerezo presided over this litigation from the
start and continues to do so.  A bench trial is scheduled to
commence before her on May 11, 1999.  The government, which is a
party to that parallel litigation, has never sought her recusal,
and apparently is satisfied that the judge's participation does not
give rise to any appearance of impropriety.  The government cannot
have it both ways.  See United States v. Tierney, 760 F.2d 382, 388
(1st Cir. 1985) ("Having one's cake and eating it, too, is not in
fashion in this circuit.").
    The other asseverations advanced by the government and
the dissent require no further response.  It suffices to say that
we have given deliberate consideration to the claims raised in this
mandamus petition, but find them largely unproven and therefore
unpersuasive.  Just as a judge must assiduously avoid participating
"in any proceeding in which h[er] impartiality might reasonably be
questioned," 28 U.S.C.  455(a), so, too, a judge must avoid
yielding in the face of unfounded insinuations.  A party cannot
cast sinister aspersions, fail to provide a factual basis for those
aspersions, and then claim that the judge must disqualify herself
because the aspersions, ex proprio vigore, create a cloud on her
impartiality.  See FDIC v. Sweeney, 136 F.3d 216, 219 (1st Cir.
1998) (per curiam); 13A Charles Alan Wright, Arthur R. Miller &
Edward H. Cooper, Federal Practice and Procedure  3542 (2d ed.
1984).  To hold otherwise would transform recusal motions into
tactical weapons which prosecutors and private lawyers alike could
trigger by manipulating the gossamer strands of speculation and
surmise.
    We need go no further.  On this meager record, Judge
Cerezo acted within her discretion in concluding that a reasonable
person, fully informed of all the facts, would not fairly question
her impartiality.  Consequently, the government has failed to
establish that the judge's failure to remove herself from the
pending criminal case warrants our intervention.

    The petition for writ of mandamus is denied and
dismissed.

                   Dissenting Opinion Follows  

    TORRUELLA, Chief Judge (dissenting).  This is not an
opinion that I embark upon with much enthusiasm.  However, because
I am firmly convinced that Chief Judge Cerezo's continued
participation in the underlying criminal case imparts an appearance
of impropriety that runs contrary to the proscriptions of  455(a),
even applying this Circuit's present abuse of discretion standard
of review, I am forced to respectfully dissent.
I.   THE CIRCUIT'S PRECEDENT
    Although judicial discipline requires that I bow to
circuit precedent, and I do, I believe that the precedent relied
upon by the majority, to the effect that review of Chief Judge
Cerezo's refusal to recuse herself is subject to appellate review
only for abuse of discretion, runs contrary to both the letter and
spirit of  455(a).  This provision leaves no discretion to the
judge if he or she comes within its purview.  
    Lest the language of this statute be somehow overlooked
in the turmoil of this appeal, I believe it appropriate to restate
its content:    
    Any judge . . . of the United States shalldisqualify himself in any proceeding in which
    his impartiality might reasonably be
    questioned.

28 U.S.C.  455(a) (emphasis added).  I can detect nothing
discretionary or equivocal in this language.  To the contrary, this
is a directive that allows for no deviation.  The judge must recuse
him or herself if his or her impartiality might reasonably be
questioned.
    This Circuit's precedent, which provides for abuse of
discretion review of district court rulings on  455(a) questions,
is particularly disconcerting because it departs from the standard
of review universally applied to mixed questions of law and fact,
according to which legal conclusions are reviewed de novo.  See,e.g., Servicios Comerciales Andinos, S.A. v. General Electric del
Caribe, Inc., 145 F.3d 463, 469 (1st Cir. 1998).  There does not
seem to be any principled reason for reviewing this particular type
of mixed question of law and fact differently.  In fact, the rule
established by precedent, which favors the discretion of the
challenged judge over the appearance that his or her actions might
reasonably convey to the citizenry, is particularly egregious
considering that it directly conflicts with Congress's purpose in  
enacting  455(a).  See In re Hatcher, 150 F.3d 631, 637 (7th Cir.
1998); see also In re United States, 666 F.2d 690, 694 (1st Cir.
1981)("[I]n drafting  455(a) Congress . . . changed the previous
subjective standard for disqualification to an objective one; no
longer [is] disqualification to be decided on the basis of the
opinion of the judge in question, but by the standard of what a
reasonable person would think.").
    I concede, however, that I am bound by the majority's
standard until such time as it is corrected by an en banc court.  
Thus, for the time being, the record must be reviewed for abuse of
discretion.  However, even under this relatively deferential
standard,  455(a) mandates Chief Judge Cerezo's recusal because
her continued participation in the underlying criminal proceeding
creates an appearance of impropriety.
II.  THE APPEARANCE OF IMPROPRIETY
    Section 455(a) goes beyond actual bias, for as the
Supreme Court has pointedly stated, "[t]he very purpose of  455(a)
is to promote confidence in the judiciary by avoiding even the
appearance of impropriety whenever possible."  Liljeberg v. Health
Services Corp., 486 U.S. 847, 865 (1988) (emphasis added). The
paramount and most obvious policy underlying  455(a) is, as we
ourselves have stated, that "courts must not only be, but must seemto be, free of bias or prejudice."  In re United States, 666 F.2d
at 694 (emphasis added).  Moreover,  455(a) imposes an independent
and continuing obligation on a judge to recuse him or herself sua
sponte if facts within his or her knowledge make it reasonable for
his or her impartiality to be questioned.  See United States v.
Cerceda, 139 F.3d 847, 852-53 (11th Cir. 1998) (quoting United
States v. Kelly, 888 F.2d 732, 744 (11th Cir. 1989)); Taylor v.O'Grady, 888 F.2d 1189, 1200 (7th Cir. 1989).  And most
importantly, "if the question of whether  455(a) requires
disqualification is a close one, the balance tips in favor of
recusal."  Nichols v. Alley, 71 F.3d 347, 352 (10th Cir. 1995);
accord United States v. Dandy, 998 F.2d 1344, 1348 (6th Cir. 1993).
    These are unchallenged standards as to which there is no
contrary circuit precedent.  It is these unquestioned canons that  
force me to part company with my colleagues in the majority, even
pursuant to abuse of discretion review, for I propose that it is
difficult if not impossible to read the record of this appeal
without at least the appearance of impropriety emanating from its
content.  At the very least, this is "a close [case]."  Nichols, 71
F.3d at 352.  As much is conceded by the majority's statement that
the facts of this case "bring it within the 'range of discretion'
in which a decision either way can 'be defended as a rational
conclusion supported  by [a] reasonable reading of the record.'"  
Supra, at 23 (emphasis added) (citation omitted).  This conclusion
alone is sufficient to "[tip] the balance . . . in favor of
recusal."  Nichols, 71 F.3d at 352.
     Additionally, the record is not as benign as my brethren
have found it to be.
III. ANALYSIS

    A.   Chief Judge Cerezo's husband was a potential
         material witness in the recusal hearing

    The government's allegations in its motion to recuse
implicated Chief Judge Cerezo's husband as a potential material
witness in the recusal hearing.  This is not far-fetched
speculation.  The government was claiming that the Cerezos received
special treatment in the handling of their loan as a result of a
special relationship that existed between Chief Judge Cerezo's
husband and one of the defendants, Lorenzo Muoz-Franco.  At a
minimum, the Chief Judge had to interpret her husband's intentions
when he wrote said defendant directly, in a familiar tone.  Seeinfra.  Her conflict, however, was much broader as she ultimately
had to pass upon the conduct of her husband and determine the
nature of his relationship to Muoz-Franco.
    Only her husband, defendant Muoz-Franco, and possibly
Chief Judge Cerezo herself, had direct knowledge of the
relationship.  Calling the defendant as a witness on this point
would have been ineffectual as he could refuse to testify.  Calling
Mr. Cerezo as a witness was thus a real possibility.  The fact that
this contingency did not materialize is irrelevant, particularly if
one considers that the failure of the government to call Mr. Cerezo
to the stand could very well have been influenced by the chilling
effect of Chief Judge Cerezo's participation in the proceedings.  
Moreover, both this potential conflict and the manner in which
Chief Judge Cerezo conducted the recusal hearing lead me to
conclude that she should not have presided over the hearing.

    B.   The nature of the underlying case
    The underlying criminal charges in the subject case,
which at the very least imply the gross mismanagement of real
estate and commercial loans, involve the very bank to which Chief
Judge Cerezo and her husband owed substantial uncollected,
delinquent sums, during the same period of time that the defendants
are alleged to have committed their criminal acts.  Although there
are obviously no allegations of criminal wrongdoing on the part of
Chief Judge Cerezo or her husband in this respect, and none should
be in any way inferred from anything said in this dissent, is it so
far-fetched to surmise that their significantly overdue debt may
have at least contributed in some degree to the bank's catastrophic
failure, even if in the total picture it was not of major impact?  
Is that not alone sufficient cause to hesitate before deciding to
act as the presiding judicial officer over the criminal trial of at
least two of the principal executive officers of that ill-fated
institution?
    I posit the following questions: Had the Caguas Federal
Bank expeditiously filed a collection and foreclosure action
against the Cerezos, would it have been proper for the Chief Judge
to sit on the criminal trial of that bank's two principal executive
officers?  I think not.  Does it make any difference that
collection letters were sent to the Cerezos, but that no suit was
filed expeditiously against them?  No.
    C.   The Cerezos' windfall
    Although the loan was principally the result of
Mr. Cerezo's dealings while acting under a power of attorney
granted by Chief Judge Cerezo, the record shows that she had actual
knowledge of the nature of the debt they owed and of the loan's
delinquency record.
    In 1986, at the time the Cerezos obtained the loan from
defendants' bank in the amount of $150,000, Mr. Cerezo's checking
account with this bank was overdrawn by more than $2,000, a
condition that persisted in similar or larger amounts throughout
all relevant periods.  This commercial loan was secured by real
estate allegedly valued at $230,000 but for which no appraisal is
found in the loan file, although reference is made to one in
correspondence.  The principal was to be repaid within one year,
with monthly installments of interest to be paid in the meantime.  
Within three months after the loan was granted in November 1986,
the Cerezos became delinquent in their interest payments, making no
further payments after February 1987, so that by the due date of
the loan in November 1987, they owed the bank in excess of $15,000
in accrued interest, in addition to the outstanding principal
balance.
    The bank failed on May 25, 1990.  As of March 1991, the
Cerezos owed about $70,000 in delinquent interest payments alone.  
A second bank eventually purchased the Cerezos' obligation and in
1994 was able, after an uncontested foreclosure, to sell the real
estate in question for $92,000.  No delinquency judgment has ever
been sought against the Cerezos for the $128,000 still owed at the
time of the foreclosure.
    While it is true that the second bank, Banco Santander de
Puerto Rico, acquired the Cerezo loan after the failure of Caguas
Federal Savings Bank and that it was Santander that failed to claim
a deficiency from the Cerezos, the fact remains that the Cerezos
received a $128,000 windfall as a result of their loan transaction
with Caguas.  Specifically, the Cerezos received a $128,000
windfall as a direct result of Caguas' mismanagement during the
almost three years that the Cerezos failed to make payments on
their loan.
    D.   Chief Judge Cerezo's conduct during the recusal
         hearing
     
    The recusal hearing took the form of a two-phased
inquiry, with the first phase being directed principally at issues
related to the government's timing in the filing of the recusal
motion, intertwined with questions relating to the Right To
Financial Privacy Act.  See 12 U.S.C.  3401.  The second phase
dealt more with the core issue of whether the Cerezos received
special treatment regarding their loan.
    In an unusual method of proceeding, the first five
witnesses (out of a total of eight heard), Juan Baralt Bentez,
Guillermo Gil, Gustavo A. Gelp, Bernard M. Brodsky, and Arturo
Somohano, Jr., were all called as witnesses by Chief Judge Cerezo,
and their direct examinations, often extensive in nature, were
conducted by her.  Although one of the witnesses' examinations,
that of Juan Baralt Bentez, was perfunctory in nature, in that he
just produced and identified the Cerezos' loan file, which up to
then had been denied to the goverment by various means, the
examinations of the other four were anything but perfunctory, and
were carried out in an often adversarial, perhaps even
inquisitorial, fashion, particularly those of Guillermo Gil and
Bernard M. Brodsky.
    The calling of Guillermo Gil as a witness by Chief Judge  
Cerezo is itself remarkable, as he is, and has been for the last
six years, the Acting United States Attorney for the District of
Puerto Rico.  According to her statement at the commencement of the
hearing, Mr. Gil was called as a witness because "there are some
questions that I [Chief Judge Cerezo] have to ask you because you
are the person who signed that motion."  Although it is not unheard
of for a lawyer to be called to testify in a proceeding in which he
is acting in his professional capacity, lawyers usually argue their
positions to the court without appearing as witnesses to justify
their contentions.
    More troubling, however, is the tenor of Chief Judge
Cerezo's interrogation of the Acting U.S. Attorney.  A reading of
even the cold letter of the transcript of these proceedings raises
genuine questions as to the Chief Judge's impartiality.  Indeed,
one might reasonably question whether she was defending a personal
predetermined position, rather than engaging in an unbiased fact-
finding inquiry.  The impression of partiality is reinforced by the
manner in which Chief Judge Cerezo questioned Mr. Gil, conducting
a paragraph by paragraph inquiry as she sought an explanation of
the various arguments contained in the Memorandum of Law that had
been submitted in support of the motion for recusal.  I, for one,
find totally inappropriate this testimonial interrogation into what
are essentially either legal issues or the thought processes behind
them.
    I also find disconcerting the vein of Chief Judge
Cerezo's examination of Mr. Gil on the issue of the production of
the Cerezos' loan file, because the questioning at times resembled
more the cross-examination of a hostile witness than an inquiry of
disputed facts by an impartial arbiter.  Although I cannot attempt
to reproduce the entire record of the case to prove this point, a
smattering will suffice.
    For example, in questioning the Acting U.S. Attorney
about the allegations in the motion to recuse, the following
exchange took place:
    THE COURT: What was your purpose, sir, in
    stating that the [loan] application is
    unsigned when there is no place there for the
    applicant to sign it, and for highlighting the
    fact that my profession is that of a federal
    judge?

    MR. GIL: Well, because it's not that -- I
    mean, we know now that your husband had a
    power of attorney from you, that it's not
    something that he filled out, this is
    something that the bank did.

    THE COURT: Let's go one by one. Why is it  
    emphasized that this application is unsigned
    when there is no place there to sign it?

    MR. GIL: Well, that's -- I don't know. It's
    just that some banks in the application
    require the customer to sign, others don't.

    THE COURT: And this one didn't. Why does the
    motion say "an unsigned application" as if
    there was an irregularity?
 
    MR. GIL: I did not mean that it was irregular.

    THE COURT: So then why is something mentioned
    that is irrelevant?

                             . . .

    THE COURT: Mr. Cerezo's profession is
    mentioned there, lawyer by profession. Then
    they say his wife, they don't even give my
    name, federal judge.  And the motion says that
    my profession [is] . . . mentioned and
    Mr. Cerezo's profession is not mentioned at
    all in the motion.  Any reason for
    highlighting my profession and not his?

    MR. GIL:  Well, Your Honor, because if  
    there's allegations that there was
    preferential treatment because who you were,
    your name appears in the name of this
    application and your relationship to
    Mr. Cerezo appears, too, in the first page.

    THE COURT: And do you understand that saying
    that my profession, the one that I've had for
    28 years, as that of a judge, is a sign of
    preferential treatment?

    Mr. GIL: No, no.

    THE COURT: Do you think they should have put
    some other kind of profession for me?

    MR. GIL: No, Your Honor.
 
    This contentious situation was exacerbated by Chief Judge
Cerezo's apparent preoccupation with whether her rights and those
of her husband under the Right To Financial Privacy Act had been
violated by the government's investigation into their financial
dealings.  We thus have this colloquy, among others, involving a
subpoena issued by the FDIC to retrieve these records:
    THE COURT: Therefore, do you understand that
    Mr. Benny Frankie Cerezo was entitled, as a
    bank customer whose records were being
    requested by government authority, to
    challenge that subpoena for lack of compliance
    with the requirements of the Right To
    Financial Privacy Act?    
     
    MR. GIL: He has all the right to do that.
    Chief Judge Cerezo's interrogation of Bernard M. Brodsky,
an attorney with the F.D.I.C. in Washington, D.C., is also highly
contentious, her questioning bordering on badgering.  Again much of
the controversy centered around the subpoena issued and the Privacy
Act implications:
    THE COURT:  Are you aware or have you read the
    Right to Financial Privacy Act?

    MR. BRODSKY:  I'm aware of it, yes, ma'am.

    THE COURT:  Have you read it?

    MR. BRODSKY:  Not recently.

    THE COURT:  At any time?

    MR. BRODSKY:  At some point in time.

    THE COURT: Did you discuss with Ms. Domnguez
    [the Assistant U.S. Attorney handling this
    case] or did she raise with you any concerns
    about the requirements of the Right to
    Financial Privacy Act?

    MR. BRODSKY:  She expressed concerns about
    that, yes . . . .

    THE COURT: . . . Was that subpoena issued as
    it would have been issued -- as any other
    subpoena would have been issued in that case?  

    MR. BRODSKY:  I'm not sure I understand the
    question, Your Honor.

    THE COURT:  If you had documents of a witness,
    would you have done it the same way that you
    did with the Judge's loan file from the
    financial institution?

    MR. BRODSKY:  Yes.  There was no distinction  
    . . . .

    THE COURT:  Did you at that time discuss with
    her, when the decision was made to issue the
    subpoena, did you discuss in any detail the
    Right to financial Privacy Act and the
    requirements of that law?

    MR. BRODSKY:  No.

    THE COURT:  Why not?

    MR. BRODSKY:  We were issuing the subpoena
    because we believed, or I believed that the
    facts that had been brought to my attention
    were sufficiently relevant to the civil
    litigation, and therefore I was issuing that
    subpoena because of our concern . . . .

    THE COURT:  . . . I ask you, since she had
    mentioned to you the Right to Financial
    Security Act, if at any point thereafter both
    of you looked into the Right to Financial
    Privacy Act before issuing that subpoena?

    MR. BRODSKY:  Well, I didn't discuss it with
    her . . . .

    THE COURT:  But you didn't discuss that with
    Ms. Domnguez?

    MR. BRODSKY:  No.  No, Your Honor, I did not.

    THE COURT:  And she didn't ask to discuss it
    with you?

    MR. BRODSKY:  No, not after she mentioned that
    there was a concern for the Financial Privacy
    Act, that's correct.

    THE COURT:  After that, you didn't discuss it
    with her --

    MR. BRODSKY:  No, Your Honor.

    THE COURT:  -- at any point? Did she ask you
    later to discuss it with her before the
    subpoena was issued?

    MR. BRODSKY:  No.

    Shortly after this line of questioning, Chief Judge
Cerezo proceeded to read the witness large portions of the Right to
Financial Privacy Act, particularly 12 U.S.C.  3403 & 3413, the
recitation of which alone takes up 10 pages of the transcript
whereupon the following exchange took place:
    THE COURT: . . . Now I ask you, knowing that,
    under what authority was this subpoena issued
    in this case?

    MR. COSTELLO [counsel for F.D.I.C.]:  Excuse
    me, Your Honor, I guess I have to object and I
    am very troubled.  The difficulty I have, Your
    Honor, as you make the recitation to the Right
    to Financial Privacy Act, is you're claiming
    certain rights vis-a-vis a subpoena that was
    issued in a civil case, your rights under the
    Right to Financial Privacy Act, the
    beneficiary under the statute.  Now we are
    here today on a motion, a hearing,
    evidentiary, in a criminal proceeding on a
    motion to recuse in which my client,
    Mr. Brodsky, was asked by the Clerk of the
    Court to appear voluntarily or in lieu of a
    subpoena, and he chose to come voluntarily and
    he is very happy to do so, but is [sic] now
    finds himself in the anomalous position where
    the beneficiary under a federal statute, who
    implicitly is claiming that the statute isn't
    followed, is asking  him questions as to
    whether he  and his agency violated the
    statute, but the person asking the questions
    isn't a private litigant, it's a federal
    judge.

    THE COURT:  No, it's a customer.

    MR. COSTELLO:  Well, its a customer, Your
    Honor, I agree.

    THE COURT:  It's a customer whose loan files
    were requested by the F.D.I.C. and it's the
    customer upon whom the Banco Santander [which
    purchased the Cerezo loan from the F.D.I.C.,
    which had in turn acquired it from the defunct
    bank] received a request from the F.D.I.C. to
    release those loans [sic].

                               . . .  

    MR. CLABAULT [counsel for the government]:  
    Your Honor, we would also object on the
    grounds that it's irrelevant because the
    subpoena was withdrawn.  It was never
    responded to, it was never litigated.  It was
    filed, objection was made by Bank Santander
    and your husband that it failed to comply with
    the Right to Financial Privacy Act, and it was
    then withdrawn . . . .

    Chief Judge Cerezo, after hearing further argument,
desisted from additionally questioning Mr. Brodsky, although she
interrupted his cross-examination by the government to further ask
about discussions between him and Ms. Domnguez regarding the Right
to Financial Privacy Act.
    Lastly, I believe, a reading of Mr. Brodsky's cross
examination by counsel for defendants, particularly by counsel for
defendant Lorenzo Muoz-Franco, reveals not only that the continued
badgering of this witness was permitted by the Chief Judge, but
that erroneous rulings were prevalent throughout.  A reading of
this examination reasonably gives rise to questions as to Chief
Judge Cerezo's impartiality.
    One of the most crucial interjections by Chief Judge
Cerezo in the recusal hearing took place during the government's
cross-examination of Mr. Somohano regarding an October 26, 1987,
letter from her husband to defendant Lorenzo Muoz-Franco. The
government's lawyer had asked Mr. Somohano to compare that
communication, in which Chief Judge Cerezo's husband addressed
Mr. Muoz-Franco as "Esteemed Friend Lorenzo," with one dated
October 29, 1987, to Mr. Somohano in which he had addressed the
latter as "Esteemed Mr. Somohano."  The following exchange took
place:
    GOVERNMENT:  So Mr. Cerezo addressed the
    president of the bank, the Defendant in this
    case, as his friend, but you're just
    Mr. Somohano, is that correct?

    THE WITNESS:  Yes, sir.

    THE COURT:  Let me ask him a question.  The
    rest of the letter, does Mr. Cerezo "tutea"
    Mr. Muoz-Franco or does he call him "su" and
    "usted"?

    THE WITNESS:  I'm sorry?

    THE COURT:  In English, people are referred to
    always as "you," there's no distinction.  In
    Spanish, you can refer to a person as "tu" or
    as "usted."  Can you look at that letter and
    see if he was using the "usted" or the "su"
    form of addressing the Estimado Amigo Lorenzo?

    . . .

    THE WITNESS:  As "usted."

    THE COURT: As "usted."  In Spanish is that the
    formal way of addressing a person?

    THE WITNESS:  Yes, it is.

    THE COURT:  Okay.  Go ahead.

    This interjection by Chief Judge Cerezo during this
pivotal segment of the cross examination, together with her benign
interpretation of this communication, contribute to the overall
appearance of partiality in two ways.  First, her questions avoid
explaining or even addressing the question of why her husband would
address defendant Muoz-Franco not only as his "esteemed friend,"
but by his first name, "Lorenzo," to boot.
    Perhaps equally important, but somehow overlooked by the
majority, is the fact that there is at least one other documented
instance in the record of direct communication by Mr. Cerezo with
defendant Muoz-Franco.  The record contains a copy of a letter
dated October 18, 1988 from Mr. Cerezo to Pedro Suau, the Bank's
Assistant Vice President in charge of commercial loans after
Mr. Somohano left the Bank early in 1988, with whom Chief Judge
Cerezo's husband was attempting to restructure the loan obligation.  
Mr Cerezo sent a copy of his letter to Mr. Suau to "Attorney
Lorenzo Muoz-Franco, President."
    Why Chief Judge Cerezo's husband chose to address
Mr. Muoz-Franco as his "[e]steemed friend Lorenzo," and why he
decided to send him a copy of the Suau letter, can only be
definitively answered by Mr. Cerezo.  In lieu thereof, however, the
matter cannot be passed over as cavalierly as it was by the
district court without creating an appearance of impartiality.  
Furthermore, I am of the opinion that the "[e]steemed friend
Lorenzo" language, which is unequivocal when compared to the
strained, over-subtle nuances which Chief Judge Cerezo reads into
this communication, requires an uncomplicated, direct construction:
there appears to be some type of personal relationship involved.
    Perhaps the ultimate problem is that too many complicated
explanations are required to set the mind at ease.  The appearances
in this case, including those relied on by the majority for
concluding otherwise, clearly lead a reasonable observer,
particularly after reading the full record of the hearing, to
harbor well-founded doubts about the propriety of Chief Judge
Cerezo's sitting as trial judge in the underlying proceedings.  The
Chief Judge's conclusion to the contrary was thus an abuse of
discretion, in my opinion.  Indeed, the majority unmistakably
questions her judicial participation in this case ("[W]e think that
the judge would have been well-advised either to bow out of the
case or to ask that the recusal motion be assigned to a different
judge for hearing . . . .", infra, at 19, "It is evident that the
judge's questioning went too far, and that its tone at times was
overly confrontational.", infra, at 20, "Thus, although Judge
Cerezo could have chosen to withdraw--indeed, we think that may
have been the wiser course and that many judges would have taken it
. . . .", infra, at 23).  What could they be referring to except an
appearance of impartiality?
    I am sorry to say, but say I must, that Chief Judge
Cerezo does not advance the cause of justice or promote confidence
in the federal judiciary by continuing to sit in this case.
    I respectfully dissent.

</body>

</html>