**UNITED STATES of America, Plaintiff,**

v.

**Phillip Kelley BOBO, Don Eugene Siegelman, and Paul Michael Hamrick, Defendants.**

**No. CR 04–C–0200–W.**

United States District Court, N.D. Alabama, Western Division.

Aug. 30, 2004.

See also 323 F.Supp.2d 1238.

William N. Clark, Redden Mills & Clark, Glennon F. Threatt, Jr., Miller Hamilton Snider & Odom LLC, Russell Jackson Drake, Whatley Drake LLC, Birmingham, AL, Charles Hardin, Ryan Degraffenried, III, Watson Degraffenried Hardin & Tyra LLP, Tuscaloosa, AL, Robert D. Segall, Copeland Franco Screws & Gill, Joseph C. Espy, III, Suzanne D. Edwards, Benjamin J. Espy, Melton Espy & Williams PC,

Ronald W. Wise, Montgomery, AL, for Defendants.

Alice H. Martin, US Attorney, Miles M. Hart, Us Attorney's Office, Birmingham, AL, John Gibbs, Melissa Kay Atwood, Office of the Attorney General, Montgomery, AL, US Marshal, United States Marshal's Office, Us Probation, United States Probation Office, Birmingham, AL, for Plaintiff.

Gilbert E. Johnston, Jr., James P. Pewitt, Keri B. Adams, Johnston Barton Proctor & Powell LLP, Birmingham, AL, for Movant.

## MEMORANDUM OPINION ON UNITED STATES ATTORNEY'S MOTION FOR RECUSAL OF THIS JUDGE AND TO RE–ASSIGN THE CASE TO A NON–ALABAMA FEDERAL JUDGE

CLEMON, Chief Judge.

On the eve of the scheduled date for an evidentiary hearing on Defendant Phillip Bobo's Motion to Dismiss the Indictment, United States Attorney Alice Martin ("USA") moved to disqualify this judge and, in effect, every other federal judge in the State of Alabama. Because the motion is based solely on innuendos, false and misleading newspaper articles, unfounded suspicions and distorted facts, is due to be denied.

This Opinion is divided into four sections. First, the facts will be set out. The second section will treat the media coverage of the disqualification issue. In the third section, the applicable legal principles will be articulated. The final section will apply the legal principles to the facts.

### A. THE FACTS

1. I have no ties to Defendant Don Eugene Siegelman ("Siegelman"). "I incorporate herein by reference the Judicial Notice of Adjudicative Facts filed on July 16, 2004." (Doc. 68, Judicial Notice)(*See* "Attachment A" to this Opinion.) The USA, through her Assistant United States Attorney ("AUSA") Matt Hart has conceded these facts. (Doc. 170, Tr. of Mot. to Disqualify of 08/17/04 at p. 4.)

2. My daughter, A. Michelle Clemon, is not my dependent and does not reside in my household.

3. Before the indictment was handed down in this case, my daughter was an associate at the law firm of Maynard, Cooper & Gale ("Maynard Cooper"). She has and had no financial interest in the firm whatsoever.

4. During her employment at Maynard Cooper, the Attorney General of the State of Alabama appointed her supervisor, David Smith, as a Deputy Attorney General to represent the State of Alabama and several of its agencies in *Crum v. State of Alabama,* 198 F.3d 1305 (11th Cir.1999), an employment discrimination case filed in 1994.[1]

---

**1.** In its Motion For Reconsideration of the Court's Denial of the Government's Motion For Recusal, (Doc. 173), the USA argues that it was "Governor Siegelman, Through His Chief Legal Advisor Edward Hosp, and Not Attorney General Pryor, [who] Made the Decision to Hire A. Michelle Clemon's Direct Supervisor David Smith and the Maynard, Cooper Law Firm." (*Id.* at p. 1.) The letter cited by the USA is dated five days prior to the letter of appointment.

But David Smith's statements are unequivocal:

> The Attorney General, Bill Pryor, is the person who contacted me about getting involved in that case and is the one who then formally engaged me and our firm to enter an appearance in that case....
>
> Attorney General Pryor and I had a relationship for years before he hired me. And I—so I know that the Attorney General had considered involving me before I was in-

5. My daughter's salary and bonuses at Maynard Cooper were not affected in any way by her work in the *Crum* litigation.

6. Although Siegelman was a nominal party to the *Crum* case, Maynard Cooper did not represent him.

7. For purposes of the USA's alleged extra-judicial bias towards federal investigative agents, I incorporate herein by reference Footnote 1 of my Memorandum Opinion on attorney disqualification. (Doc. 149, Mem. Op. Granting Mot. to Disqualify Douglas Jones and the Law Firm of Whatley Drake at p. 2 n. 1)(*See* "Attachment B" to this Opinion.)

8. I did not say to Los Angeles IRS Agent Cochran in 1995, or to anyone else at any time, that I have no confidence in federal investigative agents.[2]

9. I did not make the statements concerning federal prosecutors and law enforcement officials attributed to me in the FBI Form 302 interview notes of Joseph Rembert.

10. I do not remember which federal investigative agent served on me a subpoe-

na for my church's records in 1995 or 1996. Whoever he/she was, I hold no personal animus towards him/her, as I fully appreciate the fact that the agent was merely performing his/her duties. AUSA Hart concedes that the USA has no evidence to the contrary. (Doc. 170, Tr. Of Mot. to Disqualify of 08/17/04 at p. 30.)

11. Since the Los Angeles grand jury investigation was concluded eight years ago, without objection, I have met socially, *ex parte,* and on the record with federal prosecutors, FBI agents, and other law enforcement officials. I rely on them for crucial functions including, without limitation, the *ex parte* issuance and extension of wiretap orders. To the extent that such agents have testified as witnesses in adversary proceedings where I was the factfinder, I have assessed their credibility in precisely the same way as I have assessed the credibility of other witnesses. To my knowledge, none of them have complained of any hostility or bias on my part against them based on their status as federal law enforcement officials.[3]

---

volved, so I didn't require a referral to me, per se. . . .

Well, I have knowledge that the governor's office approved, or some-how concurred, in the attorney general's decision to engage me in that case.

(Doc. 170, Tr. of Mot. to Disqualify of 08/17/04 at pp. 9–10, 12.) The October 15, 1999 letter simply conveyed then Governor Siegelman's approval or concurrence in the Attorney General's decision to hire David Smith. This conclusion is buttressed by the fact that David Smith and the Maynard Cooper law firm continued to represent the state agencies in *Crum* even after Siegelman was defeated in his bid for re-election.

**2.** During the course of the Los Angeles investigation, I had two conversations with Los Angeles IRS Agent Ann Cochran. The first conversation took place on February 14, 1995, when she and FBI Agent Mary Jo Marino appeared at my home, informed me that I

was a subject of the grand jury investigation in Los Angeles, served me with a subpoena for my personal records, and requested an interview. Two days later, Agent Cochran telephoned me while I was on the bench. I returned her call, and she reiterated her request that I submit to an interview. In responding to her request, I reflected that seventeen years earlier, a very accommodating Los Angeles FBI agent had intercepted me at Los Angeles International Airport, informed me that my name was on an Alabama KKK hit list, and offered his assistance and advice. I mentally compared his attitude and treatment with my more recent unpleasant experience with FBI Agent Marino, and I said to Ms. Cochran that my confidence level in FBI investigative agents was not the same in 1995 as it had been earlier.

**3.** The USA's Motion for Reconsideration (Doc. 173) states as one of the "succinct facts" that I believe "there are some bad

11. Contrary to AUSA Hart's allegation,[4] I have never been a member of the Jefferson County Citizens Coalition.

12. In the hearing on the USA's Motion to Disqualify Siegelman's counsel, I did not display such deep seated antagonism against federal prosecutors, and specifically Department of Justice Attorney ("DOJ") Staci Ludwig, that a fair judgment would be impossible.[5]

13. I have had no direct or indirect financial connections to William ("Bill") Baxley in any way since our attorney-client relationship ended eight years ago. (*See* AUSA Hart's concession, Doc. 170, Tr. of Mot. to Disqualify at p. 42.)

14. Sixteen years ago, a friend and I jointly acquired an interest in a real estate partnership. In 1989, a year later, I assigned my interest in the partnership to my friend. After the assignment, my friend sold his interest in the real estate partnership to the father of one of Bill Baxley's law partners. My friend subsequently paid me for my assignment. It is my understanding that the father of Bill Baxley's law partner ultimately recouped the full amount of his investment. In any event, my direct and indirect interests in the real estate partnership came to an end fourteen years ago.

15. Most of the facts in the preceding paragraph are reflected in Northern Alabama grand jury records filed under seal with the Court in this case on August 25, 2004. (Doc.174, Mot. for Reconsideration, Addendum.) [6]

---

agents" and selectively quotes five words from the Transcript of the Motion Hearing of August 17, 2004. (Doc. 173, Mot. for Reconsideration, p. 7 at line 22.) The full sentence from the transcript is as follows: "THE COURT: And there are, in my judgment, good and bad lawyers, judges, FBI agents, court reporters, news reporters." (Doc. 170, Tr. of Mot. to Disqualify of 08/17/04, p. 28 at line 17.) I re-affirm that judgment in its entirety.

4. "In response [to the Los Angeles investigation], the Jefferson County Citizens Coalition, a political organization from the State of Alabama of which this judge was a member prior to taking the bench, mobilized to his defense."(Doc. 165, Mot. and Mem. In Support of Mot. for Recusal of 08/16/04 at p. 11)(emphasis added.)

5. I accommodated Ms. Ludwig's request to take her motion out of turn, so that she could catch an early flight back to Washington, DC. (Doc. 152, Tr. Of Motions Hr'g. of 07/28/04 at pp. 3–4.)

During the course of the hearing, Ms. Ludwig interrupted me while I was talking. The first time it happened, before the lunch recess, I warned her against doing so. (*Id.* at pp. 113, 114.) After lunch she interrupted me a second time. (*Id.* at p. 173.) As with other attorneys that have interrupted me from the bench, I promptly directed the Deputy United States Marshal to take her into custody at the next recess.

(*Id.* at p. 174.) After resting her case before the next recess, Ms. Ludwig sought leave to approach the bench and said:

> Your Honor, I understand that I inadvertently talked over you recently. I certainly didn't mean to do so. I was very concerned about—I was focused on the testimony that the witness was going to give, and I was thinking that it was confidential government information, and I was very concerned about the revealing of that particular information.
>
> I, in no way, meant to interrupt Your Honor, but I was very concerned about that. And in my view of trying to protect that information, I inadvertently talked over Your Honor, and I sincerely apologize for doing so.

(*Id.* at pp. 180–181.) I responded:

> All right. But if you thought that the matter, the confidential government matter was about to be divulged, I would have expected you to have the matter taken up *in camera,* which is how we usually do it, isn't it?
>
> I accept your apology, and I say to you that I don't expect this to happen again.

(*Id.* at p. 181.)

6. Grand jury records are secret, and they "must be kept under seal to the extent and as long as necessary to prevent the unauthorized

16. Since 1996, I have presided over several cases in which Bill Baxley and Joel Dillard represented a party. The most highly publicized of these was *United States v. Bowman,* No. CR–03–C–0056–E, 2003 WL 23272667 (N.D.Ala. Sept.12, 2003). As in all other prior cases, with full knowledge of everything contained in the sealed grand jury records, the USA never suggested that I was in any way disqualified from hearing the *Bowman* case.

17. According to AUSA Hart, Bill Baxley represents an alleged "key co-conspirator," Amy Herring, who will be called to testify in this case. Amy Herring is a cooperating witness for the USA, and Bill Baxley is facilitating that cooperation. (Doc. 170, Tr. of Mot. to Disqualify of 08/17/04 at p. 43.) Bill Baxley is not expected to enter an appearance in this case. (*Id.* at p. 63.)

18. Six other judges of this Court, including senior judges, are presumptively qualified to hear this case in the event of my disqualification.

## B. MEDIA COVERAGE OF THE DISQUALIFICATION ISSUE [7]

This case will be tried in the Tuscaloosa Division of the Northern District of Alabama. The *Tuscaloosa News* is the primary daily newspaper in Tuscaloosa, Alabama.[8] That newspaper has covered this case in at least ten articles since I was assigned to the case. Most of the statements in these articles concerning me have been factually correct. The *Tuscaloosa News* has issued a single editorial related to the issue of my disqualification. In the editorial, the *Tuscaloosa News* notes my daughter's former employment and the fact that as a judge, I have "crossed swords with Siegelman" but it concludes that none of these facts may warrant recusal. *Judicial Roulette Isn't Working,* Tuscaloosa News, July 15, 2004. However, the editorial questions the wisdom of the Court's use of a "computerized random selection" system to assign this "politically charged case." *Id.*

The *Birmingham News* is the only newspaper which, in articles largely written by its reporter Brett J. Blackledge,[9] has editorialized several times that I should disqualify myself from this proceeding—long before the USA filed this instant motion. Several of the most substantive allegations made in Mr. Blackledge's articles are simply untrue.

He has written that my daughter was a partner at the Maynard Cooper law firm.

---

disclosure of a matter occurring before a grand jury." Fed.R.Crim.P. 6(e)(6). The Supreme Court considers the secrecy of the grand jury to be "indispensable" to the functioning of the grand jury system. Charles Alan Wright, *Federal Practice and Procedure* § 106, at 363 (3d ed. 1999). These records will remain sealed in this Court to protect the security of witnesses who have testified before the grand jury, to protect the innocent who are exonerated by the grand jury from disclosure of the fact that they have been under investigation and preclude their being held up to public ridicule. *Douglas Oil Co. of California v. Petrol Stops Northwest,* 441 U.S. 211, 219, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979).

7. The Court addresses this issue largely in response to the "History of Judicial Recusal In This Case" section of the USA's combined motion-brief, which is replete with references to newspaper articles. (Doc. 165, Mot. and Mem. In Support of Mot. for Recusal of 08–16–04 at pp. 2–4.)

8. The Tuscaloosa (Western) Division of the Northern District of Alabama consists of Bibb, Greene, Pickens, Sumter, and Tuscaloosa counties. 28 U.S.C. § 81(a)(5). Birmingham is in the Southern Division of the Northern District of Alabama. The Southern Division consists of Jefferson, Shelby, and Blount counties. 28 U.S.C. § 81(a)(3).

9. For at least a decade, prize-winning reporter Val Walton has regularly covered federal courthouse matters for *The Birmingham News.*

He has written of my "longstanding ties" to Defendant Don Siegelman. In a front-page article entitled "Judge, U.S. Have Often Squared Off," after relating my alleged mistreatment of DOJ Attorney Ludwig, Mr. Blackledge wrote that:

> This was not the first clash Clemon has had with the government. The government launched a criminal investigation against him. The government sent his sister to prison. The government filed a lien against him for not paying taxes. . . .

> At least twice Clemon has been forced off cases when he refused to step down because of potential conflicts. One case involved a federal desegregation suit in which Clemon as a civil rights lawyer had once represented some of the parties and had ties to one of the lawyer. Another case was one against the Alabama Revenue Department, which previously had gone after Clemon for not paying state taxes.

**10.** The article does not mention that, unbeknownst to me, the lien was filed by IRS Agent Albert Page over twenty-five years ago. Page asserted that the lien was filed because I failed to make a tax payment as promised. During the Senate Judiciary Committee hearings on my confirmation, Senator Howell Heflin requested an FBI investigation of the matter. The investigation revealed that I had in fact made the payment as promised, and that Mr. Page had altered IRS records to delete his original entries reflecting that I had telephoned him and said that the payment was being sent to his office on the promised date. The Judiciary Committee thereafter unanimously recommended my confirmation; and the Senate by unanimous vote confirmed me as the first black federal judge in Alabama history.

*The Birmingham News'* coverage of my confirmation twenty-five years ago was critically analyzed in the publication of the Columbia School of Journalism—an institution which, like the Pulitzer Prizes, owes its existence to the will of Joseph B. Pulitzer. *See,* Stephen Barlas, *Chronicle: Birmingham Press Gets*

Brett J. Blackledge, *Judge, U.S. Have Often Squared Off,* Birmingham News, August 1, 2004, at A1.[10] One of Blackledge's articles indicated that the law firm of Whatley Drake, which I recently disqualified from representing Siegelman in this proceeding, also previously represented me in the California grand jury investigation,[11] when in fact the firm did not exist eight years ago.

The *Birmingham Post–Herald* is the afternoon daily newspaper in Birmingham which is located in the Southern Division of the Northern District of Alabama. The *Birmingham Post–Herald* featured several articles concerning this case. On the issue of my disqualification, Elaine Witt, a featured commentator for that newspaper, voiced her observations in a column affixed to this Opinion as "Attachment C."

## C. THE APPLICABLE LEGAL STANDARDS

 Title 28 U.S.C. § 455(a) requires a federal judge to disqualify himself in

*Tough—on Blacks,* Columbia Journalism Review 5,9 (1980).

To be sure, seventeen years ago the Eleventh Circuit disqualified me from serving as judge in the higher education cases, *United States v. State of Alabama,* 828 F.2d 1532 (11th Cir.1987). But the Circuit expressly rejected the argument that I should be disqualified because of personal and political ties to counsel for one of the defendants. *Id.,* at 1543, n. 46. There is no basis for Mr. Blackledge's statement that I was also disqualified because of my prior representation to some of the parties to the litigation. In fact, I had not represented any of them, and the Eleventh Circuit never said so. *Id.* at 1545.

I am unaware that the Alabama State Department of Revenue has ever sought my disqualification in any case; and in any event, I deny that the Eleventh Circuit has ever disqualified me from any case other than *United States v. Alabama,* 828 F.2d 1532.

**11.** Brett J. Blackledge, *Firm Has Ties to Earlier Defense of Clemon,* The Birmingham News, Aug. 2, 2004, at A1–A2.

any proceeding in which his impartiality might reasonably be questioned. The relevant inquiry "is not the reality of bias or prejudice, but its appearance." *Liteky v. United States,* 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The standard is whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiality. *Thomas v. Tenneco Packaging Co., Inc.,* 293 F.3d 1306, 1329 (11th Cir.2002); *Christo v. Padgett,* 223 F.3d 1324, 1333 (11th Cir.2000). In other words, the relevant inquiry is "how things appear to the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *United States v. Jordan,* 49 F.3d 152, 156 (5th Cir.1995).

■ Section 455(a) does **not** require the judge to accept as true all allegations in determining whether a reasonable person would harbor doubts concerning his partiality: for "[i]f a party could force recusal of a judge by factual allegations, the result would be a virtual 'open season' for recusal." *United States v. Greenough,* 782 F.2d 1556, 1558 (11th Cir.1986). A charge of impartiality must be supported by the facts.

■ If the judge's relative is an associate in a law firm, "and the relative's compensation is in no manner dependent upon the result of the particular case before the judge, recusal is not mandated." Guide to Judicial Policies and Procedures, Vol. 2, Advisory Op. No. 58, IV-127 (1999); *United States ex rel. Weinberger v. Equifax,* 557 F.2d 456 (5th Cir.1977).

In *Microsoft Corp. v. United States,* 530 U.S. 1301, 121 S.Ct. 25, 147 L.Ed.2d 1048 (2000), Chief Justice Rehnquist declined the invitation to disqualify himself under Section 455(a) even though his son was a partner in a law firm whose clients include Microsoft. Explaining that his son's personal and financial concerns were not affected by the decision in the pending litigation, Chief Justice Rehnquist stated that he "[does] not believe that a well-informed individual would conclude that an appearance of impropriety exists simply because [his] son represents, in another case, a party that is also a party to litigation in [the Supreme] Court." *Id.* at 1301, 121 S.Ct. 25.

■ To require recusal under Section 455(a) or 455(b)(1), the bias or prejudice of a judge must stem from an "**extrajudicial source.**" *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147 (emphasis added). The alleged bias or prejudice must be personal; "it must derive from something other than that which the judge learned by participating in the case." *Jaffe v. Grant,* 793 F.2d 1182, 1189 (11th Cir.1986). Unless the conduct reflects a "deep seated favoritism or antagonism that would make fair judgment impossible, . . . [s]trongly stated judicial views rooted in the record, a stern and short-tempered judge's efforts at courtroom administration, expressions of impatience, annoyance and even anger directed to an attorney or party should not be confused with judicial bias." Guide to Judicial Policies and Procedures, Vol. 2, Advisory Op. No. 66, IV-149 (1999).

■ Where the judge in a proceeding has a business relationship with counsel for a party to the proceeding, the judge's impartiality is reasonably questionable under Section 455(a). *Potashnick v. Port City Constr. Co.,* 609 F.2d 1101, 1110–1113 (5th Cir.1980). However, a judge's non-business relationship with counsel for a party and possible witnesses does not necessarily destroy his impartiality under Section 455(a). *Blalock v. United States,* 844 F.2d 1546, 1552 (11th Cir.1988) (involving a judge's favorable relationship with the prosecutor and FBI agents).

*In re United States,* 666 F.2d 690 (1st Cir.1981) was an effort by a United States Attorney to mandamus a district judge to disqualify himself in a criminal case. There, the judge had been legal counsel to the governor before assuming the bench. The defendant, a former state senator, had been very helpful to the governor in a legislative investigation in which the judge had allegedly been involved as legal counsel. The judge denied any involvement in the matter or any interaction with the defendant. After a barrage of critical newspaper articles, the prosecutor initiated an FBI investigation, which did not confirm the media reports. In holding that the judge properly denied the recusal motion under Section 455(a), the Court of Appeals wrote:

> [An] obvious policy is that **a judge once having drawn a case should not recuse himself on unsupported, irrational, or highly tenuous speculation:** were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges.
>
> Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, **a judge considering whether to disqualify himself must ignore rumors, innuendos, and erroneous information published as fact in the newspapers....** To find otherwise would allow an irresponsible, vindictive or self-interested press informant and/or an irresponsible, misinformed or careless reporter to control the choice of judge.... Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of factual bases for bias.... This restricted mandate to disqualify is calculated to induce a judge to tread the narrow path between timidity and tenacity.

*In re United States,* 666 F.2d at 694, 695 (emphasis added). This case was cited approvingly by our predecessor circuit in *Phillips v. Joint Legislative Com.,* 637 F.2d 1014 (5th Cir.1981)(Unit A).

## D. ANALYSIS

■ No reasonable person would question my impartiality in this case because of my daughter's former relationship with the Maynard Cooper law firm. *First,* she has had no relationship to the Maynard Cooper law firm since the indictment in this case. *Second,* she is not my dependent and does not live in my household. *Third,* she was only an associate in the law firm when it was appointed by Alabama Attorney General Bill Pryor to represent state agencies in the *Crum* litigation.

A reasonable person, knowing all the facts, would not infer bias on my part against investigative agents and officers of the United States. *First,* the only inference to reasonably be drawn from the fact of the Los Angeles grand jury investigation is that all suspicions concerning my knowledge or participation in my sister's criminality were abundantly unfounded. *Second,* no bias against federal agents can reasonably be inferred from the mere fact that I was served with a subpoena during that investigation, or that I indicated time differential levels of confidence in Los Angeles FBI agents. *Third,* a reasonable person would not infer impartiality when no complaints of hostility have been lodged by federal law enforcement officials in the past eight years I have interacted with them in the performance of our respective duties.

Of course, my conduct at the hearing on the motion to disqualify Defendant Siegelman's counsel was quintessentially **not**

"extrajudicial," nor extraordinary, nor reserved only for attorneys representing the USA.

Finally, no reasonable person would question my impartiality in this case based on the fact that a lawyer who represented me eight years ago now represents one of the USA's cooperating witnesses. Moreover, no reasonable person would infer partiality from the fact that one of my friends had a business transaction with the father of that same lawyer's partner over fourteen years ago.

A reasonable person would not entertain doubts concerning my impartiality based on writings in *The Birmingham News*. That newspaper simply cannot create, by its own untrue and misleading reports, an otherwise non-existent disqualifying appearance of impropriety. As our Circuit has written:

> To the extent the doubts [concerning the judge] were created by representatives of the press shown not to be grounded in fact, they cannot require disqualification. The mere fact that the issue of disqualification of Judge Clemon has drawn the attention of the media, resulting in extensive coverage is not, in itself, a good reason [for disqualification].

*Greenough*, 782 F.2d at 1558, 1559, *citing United States v. State of Alabama*, 582 F.Supp. 1197, 1208 (N.D.Ala.1984).

This year, for the first time in the history of the Northern District of Alabama, the United States Attorney for this district has insisted on the disqualification of a judge in a criminal case. Not only has she insisted on the disqualification of one district judge, she has insisted on the disqualification of three of the eight active judges of the court. She takes the position that the impartiality of every federal judge in this state to hear this case is reasonably questionable under Section 455(a). The

proposition is, on its face, remarkable indeed.

The USA's first "disqualification of certain judges" efforts commenced on April 13, 2004, in *United States v. Woodward*, No. CR 00–J–213–S (N.D.Ala.2000). (Doc. 278, Mem. Op. and Order of Recusal.) USA Martin's unsworn affidavit, *inter alia*, effected the disqualification of Judge Inge Johnson in that case and the Judge's self-imposed disqualification in other Government cases "until a decent cooling off period has passed." (*Id.* at p. 2.) Judge Johnson was concerned that "[t]he Government and its agencies that are represented by the U.S. Attorney should not be forced to try cases before a judge who has been slandered by the U.S. Attorney." (*Id.*)

After Judge Karon O. Bowdre disqualified herself in the instant case, it was assigned to Judge C. Lynwood Smith. The USA insisted on Judge Smith recusal's on the principal basis of his "distant relationship," i.e., second cousin, to the non-party Governor who will not be called as a witness in this case. (Doc. 43, Tr. of Telephone Conf. at p. 7.) Although Judge Smith found no facts to warrant his disqualification, he nonetheless recused to promote "confidence in the institutional integrity of the judicial branch." (Doc. 54, Order and Mem. Op. at pp. 10–11.)

This case was then re-assigned to Judge L. Scott Coogler, whose ties to the Defendant Bobo and witnesses in this case are outstanding. Bobo is the pediatrician for the judge's children. Six years ago, Dr. Bobo and other persons and/or companies associated with him contributed more than $16,500 to the judge's judicial campaign through a political action Committee ("TuscoPac"). Dr. Karl Harbin, a partner of Dr. Bobo and a witness for the USA, contributed to TuscoPac; so did Boolas J. Boohaker, an unindicted co-conspirator and a USA witness. Norman Estes, a

USA witness, contributed money directly to the Judge's campaign in 1998. Mike Echols, owner of a CPA firm (which employs the Judge's wife) housed in a building partially owned by the judge, is the treasurer of TuscoPac. (Doc. 63, Mot. to Recuse.) The USA voiced no objection to Judge Coogler's assignment to the case; and the USA silently and implicitly declined the invitation by Defendant's counsel to join in their motion to recuse Judge Coogler.

In stark contrast, now the USA seeks my disqualification on alleged "ties" far more indirect and remote than those of Judge Coogler.

The USA's inconsistent disqualification standards, applied differently to various judges of this Court, have created the ugly appearance of judge-shopping. Confidence in the institutional integrity of the judicial branch would be significantly eroded if we, as judges, facilitated this now-transparent effort by the United States Attorney to dictate which judge will (or will not) hear the criminal cases filed in this District. Although recusal is for me personally, the smoother road, it is the road not to be taken here—for there is an appalling dearth of facts which would cause a reasonable lay person to doubt my impartiality.

■ Although a moot issue, I must briefly address the USA's motion, echoing demands by *The Birmingham News*, to assign this case to a federal judge outside the State of Alabama. The motion has no legal basis whatsoever. The media may be confused over how our system works; but the USA should know better after three years in her position. A federal judge—even a chief judge—cannot simultaneously disqualify himself and assign the case to a judge outside of the district because the random assignment of judges to cases is a hallmark of our system of federal court administration. If a judge is disqualified from a case, then the case is randomly assigned to another judge of the court until all eligible judges have been disqualified. Only then is the chief district judge empowered to request the chief circuit judge to assign a judge from outside the district, rather than from outside all districts in the state.

Because, by the grace of God, truth is the currency of the courts of this great nation; and because, in the illuminating and redeeming light of truth, no reasonable person would harbor doubts concerning my impartiality, the United States Attorney's recusal motion must be DENIED in its entirety.

### Attachment "A"

### JUDICIAL NOTICE

Pursuant to his independent duty to disqualify himself in any proceeding in which his impartiality might reasonably be questioned, and in view of certain erroneous media reports concerning alleged "political ties" between himself and one of the Defendants, this Judge hereby NOTICES the following adjudicative facts.

1. Over a quarter century ago, when I was twice elected to the Alabama State Senate, the Democratic Party was the only viable political party for statewide office in the State of Alabama. Success in the Democratic primary for Alabama house and senate districts was tantamount to election. Like most of my colleagues in the Alabama State Senate, I never faced Republican opposition.

2. The late (Eleventh Circuit Judge) Robert S. Vance was the Chairman and Don Siegelman was the Executive Director of the Alabama Democratic Party at some point during my political career. I have never held office in the Alabama Demo-

cratic Party nor was I a member of its inner circle.

3. I never consulted with Don Siegelman or sought his advice, support, or financial contributions during my political years. He never offered or gave me any advice, support, or financial contributions during those years. He never enlisted my support or sponsorship of, or for, anything on his behalf or on behalf of anyone else. To the best of my recollection, I never had a substantive conversation with him while I was a Senator.

4. I have been a United States District Judge for the last twenty-four years. During the entirety of that period, I have not had political ties or connections to or with any individual.

5. My daughter, Addine Michelle Clemon, has never been a partner in any law firm. Upon her graduation from Columbia Law School in 1999, she accepted employment as an associate, *i.e.,* a salaried employee, with the Birmingham law firm of Maynard, Cooper & Gale, P.C. She remained an associate in that firm until April 2004.

6. When my aforesaid daughter made a $100 contribution to Don Siegelman's gubernatorial race in 2002, she was neither my dependent nor a member of my household.

7. One of the first cases over which I presided as a federal judge involved Don Siegelman as the lead defendant. I ruled against him. *See Whig Party of Alabama v. Don Siegelman,* 500 F.Supp. 1195 (N.D Ala.1980). Since that time, I have presided over numerous cases in which Don Siegelman was a party. *See, e.g., McKee v. James* (N.D.Ala.CV:97–C–2078–W); *Allen v. Siegelman* (N.D.Ala.CV:99–C–366–NE); *Africa v. Waggoner* (N.D.Ala.CV:98–C–1891–S); *Hawthorne v. Siegelman* (N.D.Ala.CV:00–C–100–S); *Forbes–Bey v.*

*Siegelman* (N.D.Ala.CV:01–C–579–S); *Patton v. Siegelman,* (N.D.Ala.CV:01–C–960–S).

8. No one, in any of the cases over which I have presided and in which Don Siegelman was either a party or counsel, has ever raised the recusal issue with respect to any alleged political ties between Don Siegelman and me.

The Court will set down for hearing any objection by any party to the propriety of this Judicial Notice and/or to the tenor of the matters noticed. Such objection shall be filed not later than Friday, July 23, 2004, at 4:30 p.m. *See* Federal Rule of Evidence 201.

Done this 16th day of July, 2004.

### ATTACHMENT "B"

"MEMORANDUM OPINION GRANTING MOTION TO DISQUALIFY DOUGLAS JONES AND THE LAW FIRM OF WHATLEY DRAKE"

(DOCUMENT 149 AT FOOTNOTE 1)

On February 14, 1995, this judge was notified that he was the subject of a grand jury investigation in the Central District of California involving an independent study program founded and operated by his sister. The program was housed in buildings rented from this judge; and he had made several personal loans to his sister for the operation of the program. On the same day as he was notified of the investigation, this judge spontaneously disqualified himself from all cases in which the United States was a party. He remained disqualified until notified by the United States Attorney for the Central District of California that the investigation had been closed.

This judge retained the nationally known law firm of Munger Tolles & Olson of Los Angeles, California and former Alabama Attorney General William Baxley to

 

represent him. These were his only lawyers during the course of the 15–month investigation.

Ronald M. Olson, Brad D. Brian, Bart H. Williams, and Stuart N. Senator of Munger Tolles & Olson submitted to the United States Attorney for the Central District of California on May 1, 1996, a "Report Regarding Criminal Grand Jury Investigation of the Honorable U.W. Clemon." Two weeks later, on May 14, 1996, waiving his privilege against self-incrimination, this judge submitted to a full day of interrogation by federal prosecutors of the Central District of California. A week thereafter, on May 21, 1996, United States Attorney for the Central District of California Nora M. Manella notified this judge's attorney Ronald Olson that the investigation had been closed.

During the course of the investigation, the Citizens Coalition of Jefferson County, Alabama, commenced its own investigation of the federal investigation. To the knowledge of this judge, only three lawyers were involved in the investigation and preparation of the Citizens Coalition report: Donald V. Watkins, H. Lewis Gillis of the firm of Thomas, Means & Gills, and Sam Heldman of the firm of Cooper, Mitch, Crawford, Keykendall & Whatley.

Since May 21, 1996, this judge has handled hundreds of civil and criminal cases in which the United States was a party. The United States has never moved to disqualify this judge in any of those cases. In point of fact, in his twenty-four years on the bench, the United States has never filed a motion to disqualify this judge in any case, including the present one.

This judge was unanimously confirmed by the United States Senate in 1980.

## Attachment "C"

The Birmingham News / SATURDAY / Birmingham Post-Herald

# BIRMINGHAM POST-HERALD INSIGHT

## ELAINE WITT
### Commentary

### Siegelman trial should move ... somewhere

In the 1993 film "Six Degrees of Separation," Stockard Channing's character, Ouisa Kittredge, asserts that anyone on Earth can be linked to anyone else by no more than six degrees of interaction or relation.

Thus, for example, you might be connected to President Bush by five degrees if your former boss married a woman whose brother once cut hair in the president's favorite Texas barbershop.

You might be similarly connected to Bush's Democratic rival, U.S. Sen. John Kerry, if your son had a friend whose sister once waited tables at a Boston sandwich shop favored by Kerry.

In this context, it's possible to make sense of U.S. Attorney Alice Martin's arguments for the disqualification of the latest judge to be assigned to hear the fraud and bid-rigging case of former Gov. Don Siegelman and two co-defendants.

Real or perceived conflicts of interest, especially in something as grave and important as a government corruption trial, should never be ignored.

On the other hand, if we trace conflicts of interest to the infinite degrees that Martin has suggested in various court filings, we may have to ask not only whether it's possible to find a federal judge in Alabama qualified to preside over the Siegelman case but whether it is possible to find 12 qualified jurors.

After all, federal jury lists are drawn directly from local voter rolls. Thus, it's conceivable that most potential jurors in the pool have voted either for or against Siegelman in at least one of his seven runs for seven runs for [illegible text].

There are many ways to look at Martin's various motions alleging conflicts of interest among the judges consecutively assigned to the case.

One interesting factor to consider is the political affiliations of the various judges before they were appointed to the federal bench. Judges are obliged to abandon all political activity when they are appointed to the federal bench, but no one gets a federal judgeship without ties to whichever party controls the White House at the time of appointment. Partisan concerns likewise factor into the appointment of U.S. attorneys.

The first federal judge assigned to the case, Republican Karon Bowdre, stepped down from the case before either side could object to her hearing it. Bowdre's lawyer husband had represented a company that was a losing bidder for the Medicaid contract that is a key issue in the case.

The second judge, Lynwood Smith, is a Democrat. Martin, a Republican, objected to his hearing the Siegelman case because he is related to Gov. Bob Riley, a Republican who defeated Democrat Siegelman in the 2002 governor's race. Based on Smith's relationship to Riley (the judge also had once attended a Riley fund-raiser), it might seem that if either side should have objected to Smith hearing the case it might have been Siegelman's lawyers, but they did not.

Logic suggests that both sides considered political affiliation, or some other factor, more important than Smith's relationship to Riley.

The third judge appointed, L. Scott Coogler, stepped aside after Siegelman's attorneys noted that Siegelman co-defendant Dr. Phillip Bobo—whose interests could conflict with Siegelman's in the case—owned a medical clinic at which Coogler's children had been treated. Despite this remarkably direct connection—only one or two degrees of separation, as it were—Martin did not object to Coogler, a Republican, hearing the case.

Things get more complicated when you come to Martin's objections to U.S. District Judge U.W. Clemon, a Democratic appointee currently assigned to the case. In the case of Clemon, the alleged conflicts cover so much ground that, if found to be legitimate, they could make it difficult for any well-connected lawyer to become an effective federal judge.

For example, Martin has complained that Clemon should not hear the case be-

cause his daughter once worked for a law firm with ties to Siegelman. By this logic, it's conceivable that any lawyers with close kin in the legal profession would be overwhelmed with conflicts if they became judges. And if parties didn't want their cases heard by certain judges, they could simply hire relatives of the judges they wished to disqualify.

Likewise, the government contends that because Clemon was once investigated—but never charged—by a federal prosecutor in California, he is biased against Martin's office. By this logic, if prosecutors wished to disqualify certain judges from hearing criminal cases in their districts, they could launch, and subsequently drop, cursory criminal investigations against the judges.

The little-spoken truth is that everyone is biased about something. Prosecutors, whatever their political affiliation, know that some judges tend to be more sympathetic to prosecutors and others tend to be pro-defense. The same is true in civil cases, with certain judges generally considered more pro-plaintiff and others considered pro-defense.

Most lawyers would like to get a sympathetic judge on every case, but they can't use general suppositions about a judge's leanings to have him *or* her disqualified.

Actual conflicts of interest generally are defined as direct and specific connections between a judge and a party in a case.

It's hard to say what judge—Clemon or, as Martin has suggested, a judge from another state—will ultimately hear the charges against Siegelman and his two codefendants.

Based on some of the documents that have been filed in court in recent weeks, perhaps the simplest solution would be to proactively move the trial to Nebraska and pick a judge, jury and maybe even a prosecutor from there—except that Siegelman once was a trustee of the University of Alabama, which during his term played football against the University of Oklahoma, which, of course, is in the same conference as the Nebraska Cornhuskers. Darn.